UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ASHLEY COX, individually and as next best friend of minor children K.C. and K.R., | ) ) ) | |
| *Plaintiff,* | ) ) | |
| *vs.* | ) ) | Case No. 1:19-cv-01393-JMS-DLP |
| CITY OF INDIANAPOLIS, RANDY WEITZEL, and MICHAEL O'CONNOR, | ) ) ) ) | |
| *Defendants.* | ) ) | |

## <u>ORDER</u>

On March 8, 2017, Ms. Cox was driving her daughters K.C. and K.R. home from a birthday party when she was pulled over by the police, ordered out of her car at gun point, handcuffed, placed in the back of a police cruiser, and questioned.  She filed this lawsuit against the City of Indianapolis (the "<u>City</u>") and two of the officers involved in the incident, alleging violations of her and her daughters' rights under the Fourth Amendment of the United States Constitution; under Article 1, Section 11 of the Indiana Constitution; and under Indianapolis Ordinance § 581-101 (the "<u>Ordinance</u>").   Defendants have filed a Motion for Summary Judgment, [Filing No. 87], which is now ripe for the Court's decision.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted

fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the granting of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the

cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." Johnson, 325 F.3d at 898.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Ponsetti v. GE Pension Plan, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### STATEMENT OF FACTS

The Court notes at the outset that several important facts are disputed by the parties, and the following factual background is set forth pursuant to the standards detailed above.  The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made."  Premcor USA, Inc. v. Am. Home Assurance Co., 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.  Events Leading Up to the Traffic Stop

#### 1.  Events at the Forest Ridge Apartment Complex

On March 8, 2017, Ms. Cox's five-year old daughter K.R. and seven-year old daughter K.C. went to their second cousin's Hello Kitty themed birthday party at the Forest Ridge Apartment Complex.  [Filing No. 89-1 at 58-59; Filing No. 89-3 at 34-37.]  Ms. Cox arrived at the apartment complex around 8:20 p.m., parked in the apartment complex parking lot, and went inside to the party.  [Filing No. 89-3 at 37.]  Ms. Cox's daughters were already at the party. [Filing No. 89-3 at 37.]  Ms. Cox was wearing a white scrub shirt with teddy bears on it and a light blue jacket; her daughters were wearing hot pink clothes.  [Filing No. 89-3 at 84.]

3

After "about 10, 15 minutes" at the party, Ms. Cox left with her two daughters and returned to her car—a gold Mercury Sable with the license plate 333TSE—and began driving home.  [Filing No. 89-3 at 37-38; Filing No. 95-1 at 5.]

At 8:37 p.m. on March 8, 2017, Nathan Bunghi called 9-1-1 and reported that he had been robbed at gunpoint by a black male in a brown hoodie in the parking lot of the Forest Ridge Apartment Complex.  [Filing No. 89-4 at 2.]  Mr. Bunghi told the 9-1-1 operator that the suspect fled in in a silver or gold Ford Taurus with the license plate VEN331.  [Filing No. 89-4 at 2.] The license plate number provided by Mr. Bunghi was registered to a gold Mercury owned by Gregory Weber.  [Filing No. 89-4 at 2.]

### 2.  *Ms. Cox and Mr. Bunghi leave the Forest Ridge Apartment Complex*

Mr. Bunghi pursued the suspect's car in his own car, and remained on the call with the 9-1-1 operator the entire time, updating the 9-1-1 operator of their locations as they drove.  [Filing No. 89-4 at 2-4.]  He assured officers that he never lost sight of suspect's car.  [Filing No. 89-1 at 78.]

Ms. Cox noticed a regular car following her for a while, but then at some point, there weren't any cars behind her.  [Filing No. 89-3 at 39.]  She didn't notice any police officers following her until she was a few miles from the apartment complex and about ten blocks from where she was eventually pulled over.  [Filing No. 98-3 at 39.]

Meanwhile, at approximately 8:30 p.m. that night, Indianapolis Metropolitan Police Department ("IMPD") Officer Randy Weitzel was parked at Harcourt Elementary School, and a few minutes later he received a dispatch call about an armed robbery at 79th Street and Township Line Road, *i.e.*, the intersection where the Forest Ridge Apartment Complex is located.  [Filing No. 89-1 at 31-36.]  He waited at the school—which was a few blocks away

from the address provided by dispatch[1]—to receive more information on the direction that the relevant individuals were traveling.  [Filing No. 89-1 at 36.]  That information was not relayed to him as quickly as he would have liked, so Officer Weitzel traveled north to 79th Street to see if he could find the vehicles in which Mr. Bunghi and the alleged assailant were traveling.  [Filing No. 89-1 at 36.]  Eventually, dispatch provided several updated locations, and Officer Weitzel drove to those locations "trying to catch up."  [Filing No. 89-1 at 37.]

### 3.  *Ms. Cox on College Avenue*

Ms. Cox's route home included a turn on to College Avenue, and it was then that she first noticed a police car behind her.  [Filing No. 98-3 at 39.]  While driving south on College Avenue, a police car passed Ms. Cox on the left at a high rate of speed, and she made eye contact with the officer as he passed her.  [Filing No. 89-3 at 40.]  Having passed Ms. Cox, the police car switched lanes to the lane in which Ms. Cox was driving and began to slow down, causing Ms. Cox to eventually pass the police car on the left, once again making eye contact with the police officer inside the car.  [Filing No. 89-3 at 40-41.]  The police officer then pulled behind Ms. Cox's car and followed her.  [Filing No. 89-3 at 41.]

Meanwhile, after relaying several locations, dispatch updated Officer Weitzel that the vehicles involved were "next to the KeyBank at about the same time [Officer Weitzel was] passing the KeyBank."  [Filing No. 89-1 at 40.]  Officer Weitzel noticed two cars traveling very close to each other in the left lane as he was passing them, but observed that neither vehicle had their hazard lights on, and the drivers were not attempting to flag him down.  [Filing No. 89-1 at 40.]  When Officer Weitzel realized he was passing the vehicles he had been searching for, he "stopped and waited for them to pass [him] again at about the same time [the 9-1-1 caller]

---

[1] Specifically, Harcourt Elementary School is located at the intersection of 74th Street and Harcourt Road, less than one mile from the intersection of 79th Street and Township Line Road.

announced they were at 63rd and College," which was the exact location where Officer Weitzel was waiting. [Filing No. 89-1 at 40.] Officer Weitzel testified that at that point, he thought, "yeah, I have them." [Filing No. 89-1 at 40.]

**B. The Traffic Stop**

*1. Events prior to Ms. Cox getting out of her car*

After Ms. Cox passed Officer Weitzel and Officer Weitzel pulled behind Ms. Cox, he began yelling "Get out the car" on the intercom to Ms. Cox, even though Ms. Cox was still driving and he had not turned on his lights or siren. [Filing No. 89-3 at 41-43.] Only after yelling at Ms. Cox to get out of the car did Officer Weitzel activate the red and blue lights on his car. [Filing No. 89-3 at 41.] Ms. Cox eventually found a safe place to pull over by turning onto 61st Street off of College Avenue. [Filing No. 89-3 at 43.] Because cars were parked along 61st Street, Ms. Cox stopped her car in the street. [Filing No. 89-3 at 44.]

While Mr. Bunghi was following Ms. Cox's car, IMPD Officer Michael O'Connor was parked in a grocery store parking lot speaking with another officer. [Filing No. 89-2 at 51.] The parking lot was only two blocks from the location where Officer Weitzel pulled Ms. Cox over, so when Officer O'Connor heard the dispatches about the armed robbery and the location where Officer Weitzel pulled the suspect's vehicle over, he self-dispatched to that location. [Filing No. 89-2 at 52.]

*1. Events after Ms. Cox exited her car*

After stopping her car, Ms. Cox put the car in park and got out, as the officer had ordered over the intercom. [Filing No. 89-3 at 45.] Ms. Cox estimated that after she pulled over, eighteen police cars arrived immediately on the scene. [Filing No. 89-3 at 45.] Mr. Bunghi told

the 9-1-1 operator that he could see officers had pulled over the correct vehicle.  [Filing No. 89-4 at 3.]

After Ms. Cox exited her car, Officer Weitzel instructed her to put her hands up and walk backwards toward him.  [Filing No. 89-1 at 53; Filing No. 89-3 at 45-46.]  While Officer Weitzel was instructing Ms. Cox to walk backwards toward him, a different officer was ordering Ms. Cox to stop moving.  [Filing No. 89-3 at 46.]  As Ms. Cox was walking back, a third officer asked her who else was in her car, and Ms. Cox responded that her daughters were in the car and that she did not have any weapons.  [Filing No. 89-3 at 50; Filing No. 95-3 at 13.]

While Ms. Cox was backing up toward the officers, she could see officers behind her pointing their weapons at her, and she could see red dots on her chest that she believed were coming from the officers' weapons.  [Filing No. 89-3 at 75; Filing No. 89-3 at 87.]  Eventually, Ms. Cox made her way to Officer Weitzel, who then instructed her to place her hands behind her back and handcuffed her.  [Filing No. 89-1 at 55-56; Filing No. 89-3 at 51.]  As Ms. Cox walked backwards to the police officers, Ms. Cox's daughters remained in the car and saw the officers handcuff Ms. Cox and place her in the back seat of a police car.  [Filing No. 89-3 at 45; Filing No. 95-3 at 12-15.]

Ms. Cox asked the officers what was going on and whether she had done something wrong, but the officers did not respond.  [Filing No. 89-3 at 51.]  Instead, the officers put Ms. Cox in the back of a police car that was a few cars behind her car.  [Filing No. 89-1 at 56-57; Filing No. 89-3 at 51-52.]

When Officer O'Connor arrived on the scene, Officer Weitzel had already performed the initial stop, and there were several additional officers already on scene.  [Filing No. 89-2 at 52-56.]

### C. Events While Ms. Cox Was In Custody

#### 1. *Ms. Cox's interactions with the police officers*

After Ms. Cox was placed in the backseat of the police car, she was advised of her *Miranda* rights, but she was not told why she had been pulled over and handcuffed or otherwise given an explanation of the situation. [Filing No. 89-1 at 57; Filing No. 89-3 at 52-54; Filing No. 89-3 at 90.] Ms. Cox was not asked any questions for several minutes. [Filing No. 89-3 at 52-54; Filing No. 89-3 at 90.]

Shortly after Ms. Cox was placed in the police car, she could see two police officers approaching her car with their weapons drawn. [Filing No. 89-3 at 53.] However, because she was so far away from her car, she could not actually see her car and therefore eventually lost sight of the police officers approaching her car. [Filing No. 89-3 at 53.]

After placing Ms. Cox in the back of the police car, Officer Weitzel left to go speak with Mr. Bunghi. [Filing No. 89-1 at 58.] Mr. Bunghi told Officer Weitzel that he had been robbed at gun point, saw the assailant run into a row of parked cars and when he saw Ms. Cox's car pull out immediately after, he assumed his assailant was in Ms. Cox's car. [Filing No. 89-1 at 58.] Mr. Bunghi told Officer Weitzel that he never lost visual contact of the car. [Filing No. 89-1 at 58.] Officer Weitzel did not ask Mr. Bunghi to identify Ms. Cox, nor did he ask Mr. Bunghi about the discrepancy in the license plates. [Filing No. 89-1 at 59.] When Officer Weitzel told Mr. Bunghi that the officers did not see a male in the car, Mr. Bunghi "seemed okay with that." [Filing No. 89-1 at 59.]

While she was in the police car, Ms. Cox was very upset; she was crying and hyperventilating because her handcuffs were tight and because she knew that she had not done anything wrong. [Filing No. 89-3 at 90.] After a few minutes in the police car, Ms. Cox was

able to retrieve her cell phone from her back pocket and call her father.  [Filing No. 89-3 at 59.] She asked him if he would come to 61st Street and College Avenue because she had been pulled over but was not sure what was going on.  [Filing No. 89-3 at 60.]  Ms. Cox briefly spoke to her father on the phone before she knocked on the police car window with her head and asked if the police officer outside—not Officer Weitzel or Officer O'Connor—would speak on the phone with her father.  [Filing No. 89-3 at 60.]  The officer spoke with Ms. Cox's father for "eight to ten minutes," but Ms. Cox could not hear the conversation except for the word "robbery."  [Filing No. 89-3 at 62-63.]

Around the time Ms. Cox called her father, she observed a civilian vehicle arrive on the scene, and saw various officers speak with the driver.  [Filing No. 89-3 at 91.]  At some point after that, Officer Weitzel returned to the police car and asked her if someone had jumped into her car.  [Filing No. 89-3 at 71.]  He also asked Ms. Cox whether her daughters would like any suckers.[2]  [Filing No. 89-3 at 71.]  Ms. Cox believed the suckers were "to kind of make everything peachy again or make them feel positive about it . . . because there really wasn't a reason for the suckers. My kids didn't ask for a sucker or anything.  He just kind of volunteered the suckers."  [Filing No. 89-3 at 68.]

Approximately ten minutes after the officer finished speaking with Ms. Cox's father on the phone, a different officer told Ms. Cox they were going to let her go soon.  [Filing No. 89-3 at 63.]  However, the officer that had spoken with Ms. Cox's father told her they would not let her go until she calmed down and stopped hyperventilating and crying.  [Filing No. 89-3 at 90.] Eventually, an officer opened the door and let Ms. Cox out of the police car and removed her

---

[2] Initially, Ms. Cox testified that when Officer Weitzel asked if her daughters would like suckers, she was "outside of the vehicle" and had been "released from the handcuffs."  [Filing No. 89-3 at 69.]  She subsequently clarified that she had not yet been released when Officer Weitzel asked if her daughters would like suckers.  [Filing No. 89-3 at 71.]

handcuffs, and the officer that spoke with her father returned her phone. [Filing No. 89-3 at 64-65.]

### 2. *Ms. Cox's daughters' interactions with the police officers*

Shortly after Officer Weitzel handcuffed Ms. Cox, two officers, including Officer Weitzel, approached Ms. Cox's car on either side. [Filing No. 95-3 at 15.] Both officers had their guns drawn, their weapons aimed at K.C. and K.R., and their fingers on the triggers. [Filing No. 95-3 at 15-16; Filing No. 95-4 at 14.] Officer Weitzel was the first officer to reach Ms. Cox's car. [Filing No. 89-1 at 61; Filing No. 89-1 at 79.] When he reached Ms. Cox's car, he saw two young girls in the backseat, [Filing No. 89-1 at 60], and he "pushed the gun a little higher and peeked in towards the passenger seat floor well to make sure no one was hiding down low where we couldn't see them underneath the door panel." [Filing No. 89-1 at 64.] The officer that approached K.R.'s side of the vehicle—the driver's side—left after he saw that two children were in the car.[3] [Filing No. 95-3 at 17.] The officer that approached K.C.'s side asked what she had in her hand and K.C. responded that it was a donut. [Filing No. 95-3 at 17-18.] That officer asked K.C. to open her door, again asked what was in her hand, and asked K.C. to unwrap it. [Filing No. 95-3 at 18.] K.C. unwrapped the donut, and according to K.C., the officer "looked disappointed, like, sad, like, disappointed like he wanted it to be a weapon or something." [Filing No. 95-3 at 18.]

Eventually, the officer that approached K.C.'s side of Ms. Cox's car and interacted with K.C. also left, and three different officers came to monitor the girls. [Filing No. 89-2 at 64; Filing No. 95-3 at 19.] The three officers that arrived later were Officer O'Connor, Officer

---

[3] It is not clear which side of the car Officer Weitzel approached. However, for purposes of Defendants' Motion, whether Officer Weitzel approached the driver's side or passenger's side is of no consequence.

James Cather, and Sergeant Grace Sibley, and they did not have their weapons drawn.  [Filing No. 89-2 at 64; Filing No. 95-3 at 30.]  K.C. and her sister were crying, and the three officers engaged them in conversation for about fifteen minutes, "probably to make us feel better." [Filing No. 89-2 at 65; Filing No. 95-3 at 20.]  The officers asked how the girls were doing, how their day was going, and about school.  [Filing No. 89-2 at 63; Filing No. 95-3 at 20; Filing No. 95-4 at 16.]  K.R. asked when they would get their mom back, and the female officer told her that they might get her back, but if not, the girls would "have to go to this place where someone else will take care of you."  [Filing No. 95-3 at 20-21.]  This caused the girls to cry more, and eventually they were told "that Mommy was going to come back, but it would probably take a little while."  [Filing No. 95-3 at 21.]

At some point during the girls' conversations with the various officers, an officer said that Ms. Cox had been pulled over because she didn't have her seat belt on.  [Filing No. 95-3 at 22; Filing No. 95-4 at 12-13.]

**D.  Ms. Cox Is Released From Custody**

After she was released from her handcuffs and the police car, Ms. Cox noticed three officers—two males and one female—speaking with her daughters at her car.  [Filing No. 89-3 at 66.]  After being out of the police car for about a minute and a half, an officer walked Ms. Cox back to her vehicle and told her she should have been wearing a seatbelt.  [Filing No. 89-3 at 58; Filing No. 89-3 at 93.]  Ms. Cox got in her car and drove home with her daughters.  [Filing No. 89-3 at 69.]

**E.  The Lawsuit**

Ms. Cox initiated this litigation on behalf of herself, K.C., and K.R. and, in the operative Amended Complaint, alleges claims against the City, Officer Weitzel, and Officer O'Connor

11

unlawful search and seizure, excessive force, and false arrest under the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution.  [Filing No. 26.] In addition, they allege claims under Indianapolis Ordinance § 581-101.  [Filing No. 26.]

In her Statement of Claims, Ms. Cox identifies four claims that she intends to prove at trial:  (1) claims under Indianapolis Ordinance § 581-101 based on Defendants denying Ms. Cox and her daughters the right to use city streets; (2) claims under Article 1, Section 11 of the Indiana Constitution based on unlawful searches and seizures of Ms. Cox, her children, and her vehicle, as well as excessive force used in effectuating those searches and seizures; (3) claims under the Fourth Amendment to the United States Constitution based on unlawful searches and seizures of Ms. Cox, her children, and her vehicle; and (4) claims under the Fourth Amendment to the United States Constitution for false arrest of Ms. Cox and excessive force used against Ms. Cox and her children.  [Filing No. 57 at 1-2.]

## III.
### DISCUSSION

### A.  Collateral Issues

#### 1.  Hearsay

In their response to Defendants' Motion for Summary Judgment, Ms. Cox argues that Defendants' improperly rely on hearsay evidence in support of their Motion and requests that the Court strike such evidence.  [Filing No. 94 at 2-3.]  Specifically, Ms. Cox argues that the following paraphrased statements by Mr. Bunghi are inadmissible hearsay:

1.  That Ms. Cox's vehicle was the vehicle occupied by his assailant;

2.  That Mr. Bunghi attempted to buy an iPad through the mobile application OfferUp, that he was robbed at gunpoint during the transaction, that he saw the male suspect run into a row of parked cars, that he saw Ms. Cox's vehicle immediately pull out from where the robber went, and that he maintained visual contact and followed Ms. Cox's vehicle;

3. That Mr. Bunghi was in constant eye contact with the suspect's vehicle since his assault, that the suspect was a black male wearing a brown hoodie, that Mr. Bunghi was driving a silver Honda Accord, and that the suspect was driving a gold Ford Taurus in front of him; and

4. That Mr. Bunghi had reported that he followed the specific car from moments after his assault and had never lost sight of it.

[Filing No. 94 at 3.]

Defendants reply that Mr. Bunghi's statements are not offered for the truth of the matter asserted.  [Filing No. 98 at 2-3.]

Hearsay is an out of court statement offered to prove the truth of the matter asserted in the statement.  Fed. R. Evid. 801(c).  Statements that are offered to show the effect of the statement on the listener are not hearsay.  Schindler v. Seiler, 474 F.3d 1008, 1011 (7th Cir. 2007) ("[A] statement offered to show its effect on the person who heard the statement is not hearsay.").

Mr. Bunghi's statements are not hearsay because they are not offered for the truth of the matter asserted.  Mr. Bunghi's statements are not offered to prove that Mr. Bunghi's assailant was in Ms. Cox's car—he wasn't—or that Mr. Bunghi never lost sight of his assailant's vehicle—he did.  Instead, Mr. Bunghi's statements are offered to show the effect of those statements on the listener:  in this case, the officers.  The statements' relevance is the very fact that the officers were told that Ms. Cox's car contained an armed robber and that Mr. Bunghi was sure they had the correct car.

In addition, many of Mr. Bunghi's statements are textbook examples of present sense impressions.  Mr. Bunghi's description of his attacker, description of the car, and contemporaneous reports of his location are statements "describing or explaining an event or condition, made while or immediately after [he] perceived it."  Fed. R. Evid. 803(1).

13

Accordingly, even if Mr. Bunghi's statements were hearsay, they are not excluded by the rule against hearsay.

### 2.  Statement of Claims

In support of their Motion for Summary Judgment, Defendants argue that Ms. Cox did not comply with the Court's order to identify which claims she intends to prove at trial and therefore waived all claims.  [Filing No. 88 at 7.]  Ms. Cox responds that she filed her Statement of Claims on February 13, 2020, and that it identifies four state and federal constitutional claims against Defendants.  [Filing No. 94 at 2 (citing Filing No. 57).]

The Case Management Plan, as approved by the parties on May 22, 2019, states in relevant part:

> On or before **February 12, 2020**, and consistent with the certification provisions of Fed. R. Civ. P. 11(b), the party with the burden of proof shall file a statement of the claims or defenses it intends to prove at trial, stating specifically the legal theories upon which the claims or defenses are based.

[Filing No. 15 at 4 (emphasis original).]

Ms. Cox's Statement of Claims was filed one day after the deadline set in the then-effective Case Management Plan.  Ms. Cox's counsel also filed an exhibit to the Statement of Claims in which counsel explains that she attempted to file the Statement of Claims on February 12, but could not due to technical difficulties.  [Filing No. 57-1 at 1.]  Counsel states:  "I finally reconnected several minutes into February 13, 2020.  Upon connecting, I prepared this form in Appendix D of the ECF Manual and filed the Statement of Claims."  [Filing No. 57-1 at 1.]

Ms. Cox's counsel's technical problems do not warrant dismissal of Ms. Cox's claims. Defendants have not identified any prejudice they suffered because the Statement of Claims was filed a few minutes after midnight on February 13th.  Defendants did not request to amend their

Statement of Defenses, [Filing No. 56], after Ms. Cox's Statement of Claims was filed, nor did they raise the issue in the seven months between the filing of the Statement of Claims and the Motion for Summary Judgment.  Accordingly, Defendants' Motion for Summary Judgment is **DENIED** to the extent it seeks dismissal based on the untimely filing of Ms. Cox's Statement of Claims.

That said, this Court is the third busiest district in the country, as measured by weighted filings per judgeship.  United States Courts, U.S. District Courts – Combined Civil and Criminal Federal       Court       Management       Statistics       (September       30,       2020), https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2020.pdf.       As mentioned above, the Court does not find dismissal to be appropriate in this circumstance, but Ms. Cox's counsel is reminded that she should not wait until the last minute, and she should avoid future untimely filings.

### B. Claims against Officers in Personal Capacity

#### 1. *Federal Claims*

Generally, Defendants argue that their conduct was lawful and did not violate the Constitution.  [Filing No. 88 at 8.]  They also argue that Officers Weitzel and O'Connor are entitled to qualified immunity on all claims.  [Filing No. 88 at 8.]  The Court will consider each of Ms. Cox's claims in turn.

##### a.  Seizure

Defendants argue that they did not unlawfully seize Ms. Cox or her children.  [Filing No. 88 at 14.]  They contend that the seizures were "made as Plaintiffs were subject to an investigatory stop that detained the Plaintiffs for a duration of approximately thirty minutes," but the seizure was not unlawful because "Officers Weitzel and O'Connor had reasonable suspicion

to stop [Ms. Cox's] vehicle." [Filing No. 88 at 15.] They contend that "Officer Weitzel had specific and articulable facts sufficient to give rise to reasonable suspicion that someone in [Ms. Cox's] vehicle had committed an armed robbery shortly before he encountered the vehicle, which renders Plaintiffs' brief seizure lawful." [Filing No. 88 at 15.]

Ms. Cox responds that Officer Weitzel did not have reasonable suspicion to stop her car. [Filing No. 94 at 12.] She argues that neither Ms. Cox nor her vehicle matched the information provided by Mr. Bunghi and that Ms. Cox had not committed any infractions that could have otherwise precipitated a lawful traffic stop. [Filing No. 94 at 13.] She maintains that even if Officer Weitzel had "a hunch" about the vehicle, the rest of the evidence "negates any arguably reasonable suspicion that the suspect was in [Ms.] Cox's vehicle." [Filing No. 94 at 13-14.] Aside from whether the initial stop was justified, Ms. Cox argues, Ms. Cox's extended detention was not justified by reasonable suspicion or probable cause. [Filing No. 94 at 22-23.]

Defendants reply that Officer Weitzel had reasonable suspicion based on specific and articulable facts to stop Ms. Cox's car and temporarily seize it. [Filing No. 98 at 5-6.] They argue that "even after getting [Ms.] Cox out of the vehicle there was still a reasonable belief that an armed suspect could be sitting or hiding down low in the front of the vehicle," rendering the officers' additional actions lawful. [Filing No. 98 at 7.]

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To overcome the doctrine, a plaintiff must establish: (1) that the official violated a statutory or constitutional right, and (2) that the right violated was "clearly established" at the time of the alleged misconduct. *Id.* at 232.

"[A] negative answer to either one is enough to establish the defense of qualified immunity."

*Hanes v. Zurick*, 578 F.3d 491, 493 (7th Cir. 2009).

The law is clearly established that a traffic stop without reasonable suspicion violates the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Reasonable suspicion requires only "'a particularized and objective basis for suspecting the particular person stopped' of breaking the law." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Navarette v. California,* 572 U.S. 393, 396 (2014)). "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, . . . [but t]he limit is that 'the mistakes must be those of reasonable men.'" *Id.* at 60-61 (quoting *Brinegar v. United States,* 338 U.S. 160, 176 (1949)). In addition, courts have found that officers are permitted to rely on information from callers as relayed by dispatch, even if the caller is ultimately shown to be mistaken. *See, e.g.*, *United States v. Miranda-Sotolongo*, 827 F.3d 663, 669 (7th Cir. 2016) ("Reasonable suspicion … does not require the officer to rule out all innocent explanations of what he sees. The need to resolve ambiguous factual situations—ambiguous because the observed conduct could be either lawful or unlawful—is a core reason the Constitution permits investigative stops."). *See also Hill v. Village of Crete*, 2008 WL 4559859 (N.D. Ill. Oct. 6, 2008) (finding reasonable suspicion to detain individual to investigate gun that turned out to be the plaintiff's walking cane where: (1) "an individual contacted 911 to report that a firearm was in a vehicle parked at the Shell gas station"; (2) "there were not inconsistencies between the dispatcher's description of the suspect vehicle and plaintiff's vehicle"; and (3) "based on the circumstances known to [the officer] at the time of the stop," he "reasonably believed that [plaintiff] had a gun in his vehicle").

Moreover, "qualified immunity exists . . . where there is 'arguable' probable cause, . . . and thus it likely exists in a false *Terry* stop case where there is 'arguable' reasonable suspicion. *Rouei v. Vill. of Skokie*, 61 F. Supp. 3d 765, 778 (N.D. Ill. 2014) (citing *Huff*, 744 F.3d at 1007). *See also Mitchell v. City of Indianapolis*, 2020 WL 1532201, at *10 (S.D. Ind. Mar. 31, 2020) ("A defendant is entitled to qualified immunity in this context if a reasonable officer could have believed that 'arguable' reasonable suspicion (for a *Terry* stop) or probable cause (for an arrest) existed to detain the plaintiff."). Regardless, to be entitled to qualified immunity, a defendant's belief that he had probable cause must be objectively reasonable. *Maxwell v. City of Indianapolis*, 998 F.2d 431, 436 (7th Cir. 1993). *See also Hurt v. Vantlin*, 2017 WL 1021396, at *15 (S.D. Ind. March 16, 2017) ("In this context, qualified immunity provides shelter for officers who have "arguable probable cause" to arrest—*i.e.*, those officers that reasonably but mistakenly believe they have probable cause.").

No reasonable factfinder could conclude that Officer Weitzel lacked reasonable suspicion to stop Ms. Cox's car. Mr. Bunghi reported that he was following the individual he believed had robbed him at gun point, and Officer Weitzel observed two cars at least partially matching the descriptions provided by Mr. Bunghi of his car and his suspected assailant's car driving in the location and direction described by Mr. Bunghi. [Filing No. 89-1 at 40; Filing No. 89-4 at 3.] In addition, Mr. Bunghi confirmed that Officer Weitzel had stopped the correct car. [Filing No. 89-4 at 3.] In essence, even though the exact details did not match up, Officer Weitzel had enough information—including reassurance that he was with the correct suspect—to provide him with reasonable suspicion to stop Ms. Cox's vehicle. Although Officer Weitzel was ultimately mistaken that Ms. Cox's vehicle contained the armed robbery suspect, his mistake was reasonable in light of the limited facts before him and limited amount of time he had to analyze

them.  Accordingly, no reasonable factfinder could find that Officer Weitzel lacked reasonable suspicion to stop Ms. Cox's car.

However, even if the officers—and specifically Officer Weitzel—acted reasonably in pulling Ms. Cox's vehicle over, there exists a genuine issue as to whether the officers' conduct after that point was supported by arguable reasonable suspicion or probable cause.  Reasonable suspicion "takes into account the totality of the circumstances—the whole picture." *Navarette,* 572 U.S. at 397.  "A *Terry* stop based on reasonable suspicion can ripen into a de facto arrest that must be based on probable cause if it continues too long or becomes unreasonably intrusive," *United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011), and "common sense and ordinary human experience" govern whether an investigative detention is unreasonable, *United States v. Sharpe*, 470 U.S. 675, 685 (1985).  It follows, therefore, that once an officer becomes aware of additional facts that undermine the existence of reasonable suspicion—or, in some cases, confirm the absence of reasonable suspicion or probable cause—the officer must cease any actions for which reasonable suspicion or probable cause are necessary.  *See Irvin v. Kaczmaryn*, 913 F. Supp. 1190, 1199 (N.D. Ill. 1996) ("[T]he continuation of even a lawful arrest may violate the Fourth Amendment if the police subsequently discover facts negating probable cause." (citing *BeVier v. Hucal,* 806 F.2d 123, 128 (7th Cir. 1986))).

Once Officer Weitzel had pulled Ms. Cox's car over, he would have had more time to assess the situation, including whether the vehicle matched the description relayed by Mr. Bunghi to dispatch.  In addition, he made eye contact with Ms. Cox twice while they were driving and knew she was a woman. And after Ms. Cox exited the car, every piece of information available to Officer Weitzel and the other officers differed from the descriptions Mr. Bunghi provided of his assailant—except for Ms. Cox's race.

19

The facts, viewed in the light most favorable to Ms. Cox, *Darst*, 512 F.3d at 907, show that the officers, while in search of an armed robbery suspect, were presented with the following factual scenario:

|  | Suspect as reported by Mr. Bunghi | Ms. Cox | K.R. | K.C. |
|---|---|---|---|---|
| Car Make | Ford | Mercury | | |
| Car Model | Taurus | Sable | | |
| License Plate No. | VEN331 | 333TSE | | |
| Age | Adult | Adult | 5 | 7 |
| Gender | Male | Female | Female | Female |
| Attire | Brown Hoodie | White scrubs with teddy bears and a light blue jacket | Hot Pink clothing | Hot Pink clothing |
| Race | Black | Black | Black | Black |

[Filing No. 89-3 at 34-38; Filing No. 89-3 at 84; Filing No. 89-4 at 2.]  Despite the myriad differences in the facts as reported by Mr. Bunghi and as found immediately after the stop, and with race being the only commonality between the alleged assailant and Ms. Cox and her children, a reasonable jury could readily find that the officers who handcuffed a mother at gunpoint in front of her young daughters and kept her handcuffed and in the backseat of a police car separated from her daughters for forty-five minutes acted unreasonably.

The precise point at which the officers no longer had arguable reasonable suspicion or probable cause to support their conduct, if ever, is not for the Court to determine.  In this case, the genuine issues of material fact result in "substantial, if not complete, overlap of the issue of immunity and the principle issue on the merits."  *Maxwell*, 998 F.2d at 436. *See also Hurt*, 2017 WL 1021396, at *16.  In sum, the Court finds that a reasonable factfinder could conclude that Defendants' lacked arguable reasonable suspicion or probable cause for their actions after the

initial traffic stop, and that their conduct therefore violated Ms. Cox's and her children's clearly established constitutional rights.

Accordingly, Defendants Motion for Summary Judgment is **GRANTED** with respect to Ms. Cox's Fourth Amendment seizure claim based on Officer Weitzel pulling Ms. Cox over and **DENIED** with respect to Ms. Cox's Fourth Amendment seizure claim based Ms. Cox's continued detention after being pulled over.

b.  Search

Defendants argue that the officers did not search the vehicle, did not search Ms. Cox, and did not search either daughter.  [Filing No. 88 at 5.]  Defendants argue that if their conduct was a search of Ms. Cox's vehicle, that search was lawful, minimally invasive, and "reasonable given that there was arguable reasonable suspicion to detain the occupants of the vehicle" based on the armed robbery report.  [Filing No. 88 at 13.]  They argue that Officers Weitzel and O'Connor only observed the vehicle from the outside, did not search the trunk of the vehicle, and did not search any enclosed containers inside the vehicle.  [Filing No. 88 at 13.]

Ms. Cox responds that Officer Weitzel conducted two searches—a search of Ms. Cox's car, and a search of K.C.'s person—and neither search was based on reasonable suspicion or probable case.  [Filing No. 94 at 9-10.]  She argues that "Officer Weitzel had no articulable facts supporting his conclusion that [Ms.] Cox's vehicle contained" the armed robbery suspect because Ms. Cox's vehicle was not the correct make or model and had a different license plate number.  [Filing No. 94 at 10.]  Similarly, Ms. Cox argues, she did not fit the description, and because Officer Weitzel made eye contact with her prior to pulling her over and saw both of Ms. Cox's daughters in the backseat, he could not have had reasonable suspicion to search her car.  [Filing No. 94 at 10.]  Likewise, she argues, Officer Weitzel did not have reasonable suspicion or

probable cause to search K.C. by ordering her to unwrap her donut, particularly after K.C. told him it was a donut. [Filing No. 94 at 11.]

Defendants reply that Officer Weitzel had reasonable suspicion based on specific and articulable facts to stop and perform the limited search of Ms. Cox's car. [Filing No. 98 at 5-6.] They argue that even after Ms. Cox exited the vehicle, the officers still had a reasonable belief that an armed suspect could have been hiding in the vehicle, rendering their additional actions reasonable and lawful. [Filing No. 98 at 6.]

As discussed above, viewing the facts in the light most favorable to Ms. Cox, the Court finds that a reasonable factfinder could conclude that the officers did not have arguable reasonable suspicion or probable cause to support their actions after the initial traffic stop. Because the alleged searches occurred after the initial traffic stop, Defendants Motion is **DENIED** as to Ms. Cox's claims based Defendants' alleged searches of Ms. Cox's vehicle and K.C. However, to the extent Ms. Cox initially intended to assert claims based on alleged unconstitutional searches of Ms. Cox's or K.R.'s persons, [Filing No. 26], she appears to concede that no such searches occurred, [Filing No. 94 at 9 (initial subheading stating: "the evidence demonstrates that Officers Weitzel conducted two searches," and additional subheadings stating: "Officer Weitzel searched [Ms.] Cox's vehicle" and "Officer Weitzel searched K.C.'s person")]. Accordingly, Defendants' Motion is **GRANTED** as to any claims based on alleged searches of Ms. Cox's person or of K.R.'s person.

### c. Excessive Force

Defendants argue that it was "objectively reasonable" for Officer Weitzel to draw his weapon, point his weapon at Ms. Cox's chest, handcuff Ms. Cox, place Ms. Cox in the backseat of his vehicle, and continue his investigation. [Filing No. 88 at 17-21 (citing *Jacobs v. City of*

*Chicago*, 215 F.3d 758 (7th Cir. 2000)).]  They argue that when Officer Weitzel pulled Ms. Cox over, "he had to take precautions for his safety, the safety of the other motorists on the roadway, the nearby victim, and anyone inside the vehicle."  [Filing No. 88 at 17.]  They further argue that Ms. Cox's daughters "were not handcuffed, removed from their car seats, or restrained in anyway (sic) other than stopped as part of the investigation, and if any firearm was ever brandished toward the children it was in the process of clearing the vehicle of the alleged armed suspect inside."  [Filing No. 88 at 18.]  Defendants also argue that Officers Weitzel and O'Connor are entitled to qualified immunity on Ms. Cox's excessive force claims.  [Filing No. 88 at 17.]

Ms. Cox responds that Officers Weitzel and O'Connor unreasonably threatened K.C. and K.R. with deadly force by pointing their guns at them.  [Filing No. 94 at 14.]  Ms. Cox argues that neither seven-year-old K.C. nor five-year-old K.R. posed any threat to the officers, they were not suspects, they were not attempting to flee the officers, and they were in car seats. [Filing No. 94 at 15.]  Similarly, Ms. Cox argues that Officers Weitzel and O'Connor used excessive force when they pointed their weapons at Ms. Cox.  [Filing No. 94 at 16-17.]  Ms. Cox asserts that the officers did not have reasonable suspicion or probable cause to stop Ms. Cox's vehicle, and even if they did, Ms. Cox's actions up to and after that point provide no justification for the officers pointing their weapons at her.  [Filing No. 94 at 17.]

Defendants reply that Officers Weitzel and O'Connor acted reasonably when they aimed their firearms at Ms. Cox as she exited her vehicle and when they cleared Ms. Cox's car.  [Filing No. 98 at 7-8 (citing *McDonald v. Haskins*, 966 F.2d 292, 295 (7th Cir. 1992)).]  In addition, they argue that to the extent the officers pointed their weapons at K.C. and K.R., doing so was lawful because the officers were simply clearing the vehicle of a suspected armed robber. Defendants maintain that "it was unfortunate that children happened to be in the vehicle as

officers brandished their weapons, [but] it does not distract from the officers' genuine belief that an armed robber was housed in this vehicle."  [Filing No. 98 at 9.]  In sum, they argue, "[Officers] Weitzel's and O'Connor's pointing of firearms at both Cox and the children in the vehicle was reasonable" under the circumstances, which included eye-witness reports from the victim of an armed robbery.  [Filing No. 98 at 8-9.]

Whether a particular use of force has crossed the line into excessive force is governed by the Fourth Amendment's protection against unreasonable seizures.  *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015).  The reasonableness standard is objective and set forth in *Graham v. Connor*:  The reasonableness of each use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  490 U.S. 386, 396 (1989).  "The *Graham* standard is fact-intensive, asking whether each use of force was reasonable under the totality of the circumstances, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"  *Turner v. City of Champaign*, 979 F.3d 563, 567 (7th Cir. 2020) (quoting *Graham*, 490 U.S. at 396).  The reasonableness of a use of force is a question of law for the Court to decide.  *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003) ("Since *Graham* we have regularly treated the reasonableness of force as a legal issue.").

When faced with a qualified immunity defense in the excessive force context, the plaintiff "has the burden of either identifying a 'closely analogous case that established a right to be free from the type of force the police officers used on [her]' or of showing 'that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice

that they were violating the Fourth Amendment.'" *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015) (quoting *Findlay v. Lendermon,* 722 F.3d 895, 899 (7th Cir. 2013)).

In this case, the officers were investigating an armed robbery—undoubtedly a severe and serious crime.  However, viewed in the light most favorable to Ms. Cox, the other facts did not warrant the degree of force used by the officers.  Apart from not matching the suspect's description in any way, Ms. Cox's actions demonstrated that she did not pose any risk—immediate or otherwise—to the safety of the officers or others.  Rather, if there was any risk to the safety of the officers or others, the risk was created by the officers themselves.  Similarly, Ms. Cox was not resisting arrest.  Officer Weitzel testified that she was not speeding or otherwise committing any traffic violations, [Filing No. 89-1 at 53-54], she complied with the officers' commands promptly and with civility, and for the vast majority of the events in question, she was handcuffed and in the backseat of a police car.

With respect to qualified immunity, the facts viewed in the light most favorable to Ms. Cox show that the force used was so plainly excessive that as an objective matter, the officers were on notice that they were violating the Fourth Amendment.  Ms. Cox was unarmed, walking backwards (as requested by Officer Weitzel), crying, and when she reached Officer Weitzel, proactively offered her identification.  Ms. Cox's children were in car seats, and K.C. was holding a donut.

Even if the officers' conduct wasn't so plainly and objectively excessive, there are several cases decrying the levels of forced allegedly used by the officers in this case.  *See Jacobs v. City of Chicago,* 215 F.3d 758, 773–74 (7th Cir. 2000) (unreasonable use of force where "officer kept the gun pointed at [the plaintiff] for over ten minutes, even after ascertaining that [the plaintiff] was not the person he was looking for, and during which time [the plaintiff] did nothing more

threatening than provide the officer with his identification and ask the officer for permission to sit down"); *McDonald v. Haskins,* 966 F.2d 292, 294–95 (7th Cir. 1992) (officer's "threat of deadly force—holding a gun to the head of a 9–year–old and threatening to pull the trigger—was objectively unreasonable given the alleged absence of any danger to [the defendant-officer] or other officers at the scene and the fact that the victim, a child, was neither a suspect nor attempting to evade the officers or posing any other threat").

The parties have vastly differing versions of the situation, including each person's demeanor, intensity, emotional state, motivations, and actions. Ms. Cox's version—which is the Court's focus for purposes of this motion—describes shocking, offensive, and senseless behavior by the police toward an innocent Black woman driving her young children home from a birthday party. It is this version on which the Court must base its decision, and therefore, Defendants' Motion is **DENIED** as to Ms. Cox's claims for excessive force.

### d.  False Arrest

Defendants argue that Ms. Cox and her daughters "were never arrested but were rather subject to a 30-minute custodial interrogation and lawful detention." [Filing No. 88 at 27.] They argue that based on the reliable information from the victim of an armed robbery, the officers were permitted to perform a reasonable search for weapons for their protection on the basis of reasonable suspicion. [Filing No. 88 at 26 (citing *United States v. Mancillas,* 183 F.3d 682, 697 (7th Cir. 1999)).] Defendants argue that even if Ms. Cox's detention was transformed into an arrest, the officers had probable cause to arrest her, and that probable cause is an absolute defense to a false arrest claim. [Filing No. 88 at 21.]

Ms. Cox argues that the traffic stop was converted to an arrest because "Defendants escalated the interaction with Plaintiffs beyond what was necessary for checking Cox's vehicle for a robbery suspect." [Filing No. 94 at 23.]

Defendants reply that "Plaintiffs' detention was lawful and did not amount to an arrest." [Filing No. 98 at 9.]

"[A] claim for false arrest is a claim for the harm of being unlawfully imprisoned through some extrajudicial act that does not amount to legal process, for example, when a police officer performs a warrantless arrest without probable cause." *Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 899 n.9 (7th Cir. 2001). "A traffic stop can be converted into a full-blown arrest if it extends beyond the time reasonably necessary to complete the purpose for which the stop was made." *Huff v. Reichert*, 744 F.3d 999, 1005 (7th Cir. 2014) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "For an investigative stop based on reasonable suspicion to pass constitutional muster, the investigation following it must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests." *United States v. Bullock,* 632 F.3d 1004, 1015 (7th Cir. 2011). In other words, an initially lawful *Terry* stop based on reasonable suspicion "may be transformed into a formal arrest requiring probable cause if an officer's use of force is sufficiently disproportionate to the purpose of the stop—which may include ensuring the safety of the officers or others—in light of the surrounding circumstances. It may also become a de facto arrest if the detention continues longer than necessary to accomplish the purpose of the stop or becomes 'unreasonably intrusive.'" *Matz v. Klotka*, 769 F.3d 517, 524-25 (7th Cir. 2014) (internal citations omitted). In evaluating whether the force used converted an encounter into a full arrest, courts have considered "the hallmarks of a formal arrest such as applying handcuffs,

drawing weapons, and placing suspects in police vehicles," as well as whether the surrounding circumstances would support an officer's legitimate fear for personal safety and whether the suspect's resisted the officer's efforts.  *Id.* at 526 (citing *United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011); *Jewett v. Anders*, 521 F.3d 818, 824-25 (7th Cir. 2008))

Viewing the facts in the light most favorable to Ms. Cox, there is a genuine issue as to whether Ms. Cox was arrested.  Apart from being pulled over, Ms. Cox was ordered from her car, handcuffed, placed in the back of a police car, informed of her *Miranda* rights, and kept in the police car for thirty to forty-five minutes.   [Filing No. 89-3 at 57.]   Under these circumstances, a reasonable factfinder could understand the situation to have constituted a restraint on Ms. Cox's freedom of movement of the degree associated with a formal arrest.  In addition, a reasonable factfinder could conclude that keeping Ms. Cox handcuffed in the backseat of a police car and away from her daughters for at least thirty minutes was exceeded the time reasonably necessary to determine that the armed robber was not in Ms. Cox's vehicle.  Ms. Cox's vehicle did not match the make, model, or license plate number of the assailant's reported vehicle, and none of the occupants of Ms. Cox's car could have been reasonably mistaken for a male in a brown hoodie. Finally, refusing to release Ms. Cox until she calmed down – after pointing their weapons at her and her children, handcuffing her and holding her for 45 minutes – may well be deemed unreasonable by a reasonable factfinder.

As discussed above, a reasonable factfinder could find that the officers arrested Ms. Cox without probable cause, and there can be no question that an individual's right to be free from arrest without probable cause is clearly established.   Accordingly, Defendants' Motion is **DENIED** with respect to Ms. Cox's claims for false arrest.

2. *State Law Claims*

a. <u>Claims Under the Ordinance</u>

Defendants argue that they did not violate the Ordinance because they did not "impede[] the Plaintiffs from any employment endeavor, education opportunity, or the acquisition of real estate." [Filing No. 88 at 10.]  In addition, they contend that Ms. Cox's and her children's races, genders, sexual orientations, disabilities, and veteran status were not relevant to anything that occurred during the stop. [Filing No. 88 at 10.]  To the extent Ms. Cox and her daughters were prevented from using public rights of way, Defendants argue, they were so prevented based on a report that an armed robbery suspect was fleeing in Ms. Cox's car, not based on their protected status. [Filing No. 88 at 10.]  Defendants maintain that "after Plaintiffs were released from detention, they were free to return to pursing educational opportunities, employment opportunities, acquire real estate, and to use public accommodations." [Filing No. 88 at 10.]

Ms. Cox responds that "[t]here is a genuine dispute over the reason Defendants prevented [Ms.] Cox from using the public street." [Filing No. 94 at 7.]  Ms. Cox asserts that she was stopped because she is African American, and not because of the report that an armed robbery suspect was in her car. [Filing No. 94 at 7-8.]  She argues that the only commonality between her and the robbery suspect is their race, and that every other piece of information about the suspect—including gender, attire, vehicle color, vehicle make and model, and vehicle license plate—did not match Ms. Cox or Ms. Cox's vehicle.  She further argues that Officer Weitzel "did not perform any independent check on the suspect vehicle's license plate." [Filing No. 94 at 8] (citing Filing No. 89-1 at 55).]  In sum, she argues, "[Ms.] Cox's race was the only reason Officer Weitzel connected her to the alleged robbery incident and denied her from using the public street.  He denied [Ms.] Cox use of the public street for approximately 45 minutes based on her

race and nothing more.  Officer Weitzel's race-based denial of equal access to the public street is discriminatory and violates [the Ordinance]."  [Filing No. 94 at 9 (citations omitted).]

In reply, Defendants argue that the Ordinance does not provide a private right of action. [Filing No. 98 at 5.]  They argue that Officer Weitzel stopped Ms. Cox's vehicle based on a report that the individual who had just committed an armed robbery was in the car, and "Plaintiffs' race and gender did not influence why this vehicle was stopped."  [Filing No. 98 at 5.]

The Court issued an order pursuant to Federal Rule of Civil Procedure 56(f)(2) that it intended to grant Defendants' Motion as to Ms. Cox's claims under the Ordinance on grounds not raised by Defendants, and the Court gave Ms. Cox an opportunity to respond.  [Filing No. 99.] Specifically, the Court noted that the Court's researched revealed that the Ordinance did not provide a private right of action.  [Filing No. 99 at 2.]

In her response to the Court's Order, Ms. Cox argues that "the City of Indianapolis's Municipal Ordinance 581-101, as applied to her, violates the Indiana Constitution."  [Filing No. 100 at 1.]  She elaborates that "Ordinance 581-101 specifically gives [Ms.] Cox a right to use the city streets regardless of her race.  This right was not equally available to [Ms.] Cox because the color of her skin was the only reason her vehicle, her person, and her children were seized. Therefore, [Ms.] Cox may raise an as applied challenge to the ordinance under Article 1, Section 23 [of the Indiana Constitution]."  [Filing No. 100 at 2.]

Ms. Cox's response is confusing, and it is not clear whether her claims are based on an alleged violation of the Ordinance, or based on a theory that the Ordinance itself was unconstitutional.  Regardless, summary judgment is appropriate.  As an initial matter, Ms. Cox's entire argument under the Ordinance is that the officers violated the ordinance and thereby violated her rights.  The idea that a violation of the Ordinance—which she expressly states

"specifically gives her a right to use the city streets regardless of her race," [Filing No. 100 at 2]—somehow renders the Ordinance itself unconstitutional is without a legal basis and has never been raised previously by Ms. Cox.

Not every statute or ordinance creates a private right of action. *Cuyler v. United States*, 362 F.3d 949, 952 (7th Cir. 2004). Whether a statute creates a private right of action is a question of law for the court. *Howard Regional Health Sys. v. Gordon*, 952 N.E.2d 182, 187 (Ind. 2011).

In Indiana, "the issue when a plaintiff claims a private right of action is whether the legislative body intended to establish not just a standard of conduct but a duty enforceable by tort law." *Stachowski v. Estate of Radman*, 95 N.E.3d 542, 545 (Ind. Ct. App. 2018) (citing *Estate of Cullop v. State*, 821 N.E.2d 403, 408 (Ind. Ct. App. 2005); *Cuyler v. United States*, 362 F.3d 949, 952 (7th Cir. 2004)). Indiana courts "have a well-established standard for determining whether a legislative body intended to confer a private right of action. Absent an express right of action, the primary considerations are (1) whether the statute or ordinance was designed to protect particular individuals or the public in general and (2) whether it includes an independent enforcement mechanism." *Id.* at 546 (citing *Doe #1 v. Ind. Dep't of Child Servs.*, 81 N.E.3d 199, 202–04 (Ind. 2017); *Estate of Cullop*, 821 N.E.2d at 408). In other words, if a statute or ordinance does not expressly provide a private right of action, courts "usually will not infer a private right of action when the statute (1) primarily protects the public at large and (2) contains an independent enforcement mechanism." *Doe #1*, 81 N.E.3d at 202; *Howard Regional Health Sys.*, 952 N.E.2d at 187 ("A private party may not usually enforce rights under a statute designed to protect the public in general and which contains an enforcement provision. When a statute

limits a thing to be done in a particular mode, it includes the negative of any other mode." (internal citations and quotations omitted)).

The relevant sections of the Indianapolis Code of Ordinances do not expressly provide a cause of action. The Court must therefore determine whether the Ordinance was designed to protect particular individuals or the public in general and whether it includes an independent enforcement mechanism. *See Stachowski*, 95 N.E.3d at 546.

The legislative purpose is laid out in Section 581-101:

> (a) The council finds that the practice of denying equal opportunities in employment, education, access to and use of public accommodations,[4] and acquisition of real estate based on race, color, religion, ancestry, age, national origin, disability, sex, sexual orientation, gender identity, or United States military service veteran status is contrary to the principles of freedom and equality of opportunity and is a burden to the objectives of the policies contained herein and shall be considered discriminatory practices.[5]

---

[4] *"Public accommodation* means an establishment which caters to or offers its services, facilities or goods to the general public.

*Public facility* means any facility or establishment, other than an educational institution, which is owned, operated or managed by or on behalf of a governmental agency." Indianapolis Ord. § 581-103.

[5] "*Discriminatory Practice* means and includes the following:

> (1) The exclusion from or failure or refusal to extend to any person equal opportunities or any difference in the treatment of any person by reason of race, sex, sexual orientation, gender identity, religion, color, national origin or ancestry, disability, age, or United States military service veteran status;

> (2) The exclusion from or failure to extend to any person equal opportunities or any difference in the treatment of any person, because the person filed a complaint alleging a violation of this chapter, testified in a hearing before any members of the board or otherwise cooperated with the office or board in the performance of its duties and functions under this chapter, or requested assistance from the board in connection with any alleged discriminatory practice, whether or not such discriminatory practice was in violation of this chapter . . . ."

Indianapolis Ord. § 581-103.

(b) It is the purpose of this chapter to carry out the following policies of the city and county:

    (1)    To provide equal employment opportunity in all city and county jobs without regard to race, color, religion, disability, national origin, ancestry, age, sex, sexual orientation, gender identity, or United States military service veteran status;

    (2)    To encourage the hiring of the persons with disabilities in both the public and the private sectors and to provide persons with disabilities with equal access to public accommodations;

    (3)    To utilize businesses owned by persons with disabilities;

    (4)    To protect employers, labor organizations, employment agencies, property owners, real estate brokers, builders, lending institutions, governmental and educational agencies and other persons from unfounded charges of discrimination;

    (5)    To provide all citizens of the city and county equal opportunity for education, employment, and access to public accommodations without regard to race, religion, color, disability, sex, sexual orientation, gender identity, national origin, ancestry, age, or United States military service veteran status; and

    (6)    To provide all citizens of the city and county equal opportunity for acquisition through purchase or rental of real property including, but not limited to, housing without regard to race, religion, color, disability, sex, sexual orientation, gender identity, familial status, national origin, ancestry, age or United States military service veteran status.

Indianapolis Ord. § 581-101.  The Ordinance states that "[e]ach discriminatory practice as defined in section 581-103 of this chapter (including any retaliatory practice encompassed within the definition of 'discriminatory practice') shall be considered unlawful unless it is specifically exempted by this chapter."  Indianapolis Ord. § 581-403.  The Ordinance also creates an "office of equal opportunity," (the "Office") and states that the Office shall monitor internal employment practices and "receive, investigate and adjudicate community complaints as specified in Article IV of this chapter."  Indianapolis Ord. § 581-202.  In Article IV Ordinance contains an enforcement provision:

33

> (a) A complaint charging that any person has engaged in or is engaging in a discriminatory practice prohibited by section 581-403 of this chapter may be filed *with the office* by any person claiming to be aggrieved by the practice, by one (1) or more members of the board or by one (1) or more employees of the office who have reasonable cause to believe that such a violation has occurred, in any of the following circumstances:
>
> \*\*\*
>
> (3) In the case of a public accommodation, against the owner or person in charge of any such establishment, or both;
> (4) In the case of a public facility, against the governmental body which operates or has jurisdiction over the facility . . . .

Indianapolis Ord. § 581-405 (emphasis added).

The Ordinance does not create a private right of action.  On its face, the Ordinance is designed to "provide *all citizens* of the city and county equal opportunity for education, employment, and access to public accommodations without regard to race, religion, color, disability, sex, sexual orientation, gender identity, national origin, ancestry, age, or United States military service veteran status."  Indianapolis Ord. § 581-101(b).  When a statute is designed mainly for public benefit, it implies no right of action; incidental benefits to a private party make no difference."  *Doe #1*, 81 N.E.3d at 202; *Whinery v. Roberson*, 819 N.E.2d 465, 474 (Ind. Ct. App. 2004) ("A private cause of action will not be inferred where the legislature imposes a duty for the public's benefit.")  The Ordinance here is designed mainly for the public benefit, and its incidental benefit to Ms. Cox is inconsequential to that determination.

In addition, the Ordinance provides an enforcement mechanism:  a person claiming to be aggrieved by a practice declared unlawful by the ordinance—like Plaintiffs in this case—may file a complaint with the Office created by the Ordinance.  "When a statute expressly provides one enforcement mechanism, courts may not engraft another."  *Doe #1*, 81 N.E.3d at 204 (holding that a statute requiring reporting of child abuse provided two enforcement mechanisms:

(1) a person who violates the statute commits a Class A infraction carrying a fine of up to $10,000; and (2) "that employee may also be disciplined in accordance with the personnel policies of their agency" (internal quotations omitted)).  *See also Borne*, 532 N.E.2d at 1203 ("[I]f it appears that the duty imposed is merely for the benefit of the public, and the fine or penalty a means of enforcing the duty and punishing a breach thereof, the fine or penalty is exclusive, and a private action cannot be maintained for injury by reason of the breach." (quoting *Bartholomew Cty. Beverage Co. v. Barco Beverage Corp.*, 524 N.E.2d 353, 356 (Ind. Ct. App. 1988)).

Finally, the Indianapolis City Council expressly provided for judicial enforcement in certain circumstances.  Section 581-415(a) provides that "[i]n any case where the board, the adjudication committee or the hearing officer has found that a respondent has engaged in or is engaging in a discriminatory practice in violation of section 581-403 of this chapter, and such respondent has failed to correct or eliminate such discriminatory practice within the time limit prescribed by the board, the adjudication committee or the hearing officer and the time limit for appeal to the board has elapsed, the board may file in its own name in the Marion County Circuit or Superior Courts a complaint against the respondent for the enforcement of" the findings.  Moreover, where a person claiming to be aggrieved files a complaint with the Office, "In any case where the board, the adjudication committee or the hearing officer has found that a respondent has engaged in or is engaging in a discriminatory practice in violation of section 581-403 of this chapter, and such respondent has failed to correct or eliminate such discriminatory practice within the time limit prescribed by the board, the adjudication committee or the hearing officer and the time limit for appeal to the board has elapsed, the board may file in its own name in the Marion County Circuit or Superior Courts a complaint

against the respondent for the enforcement of section 581-414 of this chapter." Indianapolis Ord. 581-415(c).

Accordingly, it is clear from both the express statements in the Ordinance, as well as the fact that the Ordinance provides for the use of courts in certain limited circumstances that the Indianapolis City Council did not intend to create a private right of action. The Ordinance is designed to protect the public generally and contains its own enforcement mechanisms. The Court does not hold that Defendants did not violate the Ordinance. Instead, the Court finds that the Ordinance, even if violated, does not provide Ms. Cox a private right of action. Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** as to Ms. Cox's claims under the Ordinance.

### b. Claims under Indiana Constitution

As it did with Ms. Cox's claims under the Ordinance, the Court issued an order pursuant to Rule 56(f) informing the parties that it intended to grant Defendants' Motion on Ms. Cox's claims under the Article 1, Section 11 of the Indiana Constitution on grounds not raised by the moving party. [Filing No. 99.] Specifically, the Court's research revealed that Article 1, Section 11 of the Indiana Constitution does not provide a private right of action. [Filing No. 99 at 1-2.]

In her response to the Court's Order, Ms. Cox argues that she "does not raise a separate claim under Article 1 Section 11 of the Indiana Constitution. Rather, she claims that Defendants' search and seizure was unreasonable when duly analyzed under Article 1, Section 11 of the Indiana Constitution as well as the Fourth Amendment." [Filing No. 100 at 2.]

"There is no explicit language in the Indiana Constitution providing any specific remedy for violations of constitutional rights." *Cantrell v. Morris*, 849 N.E.2d 488, 499 (Ind. 2006). *See also McConnell v. McKillip,* 573 F. Supp. 2d 1090, 1103 (S.D. Ind. 2008) ("[T]he Indiana

Supreme Court . . . recognized that Indiana has no statutory provision like § 1983 that creates an explicit civil remedy for constitutional violations by individual officers or governmental entities."); *Willits v. Wal-Mart Stores, Inc.*, 2001 WL 1028778, at *15 (S.D. Ind. July 30, 2001) ("This Court agrees with the reasoning of Judge Tinder, and similarly declines to recognize an implied right of action under Article 1, Section 11 of the Indiana Constitution." (citing *Baker v. Washington Board of Works,* 2000 WL 33252101, at *8 (S.D. Ind. June 8, 2000)).

In any event, Ms. Cox clarifies that she is not pursuing any claims under Article 1, Section 11 of the Indiana Constitution. [Filing No. 100 at 2.] Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiffs' claims under the Indiana Constitution.

### C.  Claims against the City

Defendants argue that Ms. Cox's *Monell* claims against the City fail because "there is no evidence that any policy, custom or practice caused a constitutional violation." [Filing No. 88 at 32.] Defendants contend that to the extent Ms. Cox relies on the various General Orders she cites, "[t]here is nothing in these express policies that, when enforced, cause a constitutional deprivation." [Filing No. 88 at 32.]

In response, Ms. Cox argues:  "Defendants present a general discussion of *Monell* claims in this section.  This discussion is not enough for Plaintiffs to respond.  Defendants point to no evidence or claims.  Consequently, Plaintiffs are rendered wholly unable to respond to this section." [Filing No. 94 at 25.]

In their Reply, Defendants do not address or present any argument with respect to Plaintiffs' claims against the City.

"Failure to respond to an argument . . . results in waiver." *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).  Despite Ms. Cox's assertion to the contrary, Defendants argue

that her *Monell* claims fail because there is no evidence that any policy, custom, or practice caused the alleged constitutional violations.  Ms. Cox failed to respond—and indeed chose not to respond—to Defendants' argument and therefore has waived any argument to the contrary.

Regardless, Defendants' argument is correct.  "A village or other municipality may be found liable under § 1983 when it violates constitutional rights via an official policy or custom." *Wragg v. Village of Thornton,* 604 F.3d 464, 467 (7th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978)).  "To establish an official policy or custom, a plaintiff must show that [her] constitutional injury was caused 'by (1) the enforcement of an express policy of the [village], (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority.'"  *Id.* at 467 (quoting *Latuszkin v. City of Chicago,* 250 F.3d 502, 504 (7th Cir. 2001)).

Ms. Cox des not identify in her Amended Complaint, Statement of Claims, or Response to Defendants' Motion a practice, policy, or custom that caused the alleged constitutional violations.  Similarly, she does not allege or present evidence that a person with final policymaking authority caused the alleged constitutional violations.  Accordingly, Defendants' Motion is **GRANTED** as to Ms. Cox's claims against the City.

### D.  Claims against Individual Defendants in Official Capacities

Defendants argue that a suit against a municipal officer in his or her official capacity is functionally equivalent to a suit against the municipal entity.  [Filing No. 88 at 32 (citing *Smith v. Ciesielski*, 975 F. Supp. 2d 930, 937 (S.D. Ind. 2013)).]  Defendants assert that the claims against Officers Weitzel and O'Connor in their official capacities are duplicative of Ms. Cox's claims against the City.  [Filing No. 88 at 32.]  Therefore, Defendants argue, the claims against Officers

Weitzel and O'Connor should be dismissed for the same reasons that the claims against the City should be dismissed.  [Filing No. 88 at 32.]

In Response, Ms. Cox argues:  "Defendants argue Plaintiff cannot pursue claims against Officers Weitzel and O'Connor in their official capacities.  The argument does not provide enough analysis of this argument for Plaintiffs to respond.  Defendants fail to identify what claims they are seeking summary judgment on.  Therefore, Plaintiffs cannot properly respond to this section[.]"  [Filing No. 94 at 25 (citations omitted).]

In their Reply, Defendants do not address or present any argument with respect to Plaintiffs' claims against the individual defendants in their official capacities.

As stated above, "[f]ailure to respond to an argument . . . results in waiver." *Bonte*, 624 F.3d at 466.  Despite Ms. Cox's assertion, Defendants argued that her claims against Officers Weitzel and O'Connor in their official capacities are tantamount to claims against the City, and therefore fail because there is no evidence that any policy, custom, or practice that caused the alleged constitutional violations.  Ms. Cox failed to respond to Defendants' argument and has therefore waived any argument to the contrary.

In any event, Defendants' argument is correct:  "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell*, 436 U.S. at 690 n.55.  Accordingly, "in an official-capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law." *Kentucky v. Graham*, 473 US. 159, 166 (1985).  Ms. Cox has not identified a policy, custom, or practice that caused the alleged constitutional violations.  Therefore, Defendants' Motion is **GRANTED** as to Ms. Cox's claims against Officers Weitzel and O'Connor in their official capacities.

**IV.**

**CONCLUSION**

Consistent with the foregoing, Defendants' Motion, [87], is **GRANTED IN PART** and

**DENIED IN PART** as follows:

- The Motion is **GRANTED** as to Ms. Cox's claims under the Fourth Amendment against the individual defendants in their personal capacities based on the initial traffic stop;

- The Motion is **DENIED** as to Ms. Cox's claims under the Fourth Amendment against the individual defendants in their personal capacities based on Officer Weitzel's and Officer O'Connor's actions after the initial traffic stop;

- The Motion is **GRANTED** as to Ms. Cox's claims under the Ordinance;

- The Motion is **GRANTED** as to Ms. Cox's claims under Article 1, Section 11 of the Indiana Constitution;

- The Motion is **GRANTED** as to Ms. Cox's claims against the City; and

- The Motion is **GRANTED** as to Ms. Cox's claims against Officers Weitzel and O'Connor in their official capacities

The following claims **SHALL PROCEED**:

- Ms. Cox's individual and representative claims against Officers Weitzel and O'Connor in their personal capacities under the Fourth Amendment based on their continued seizure of Ms. Cox after the initial traffic stop;

- Ms. Cox's individual and representative claims against Officers Weitzel and O'Connor in their personal capacities under the Fourth Amendment based on the searches of Ms. Cox's vehicle and K.C.'s person;

- Ms. Cox's individual and representative excessive force claims against Officers Weitzel and O'Connor in their personal capacities under the Fourth Amendment; and

- Ms. Cox's personal false arrest claim against Officers Weitzel and O'Connor in their personal capacities under the Fourth Amendment.

The Court requests that the Magistrate Judge confer with the parties as soon as practicable to

discuss the possibility of resolving the remaining claims short of trial.

Date: 2/25/2021

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**